189 P.3d 759 (2008)
In the Matter of the PERSONAL RESTRAINT OF Richard J. DYER, Petitioner.
No. 79872-9.
Supreme Court of Washington, En Banc.
Argued November 27, 2007.
Decided August 7, 2008.
*762 David Zuckerman, Seattle, for Petitioner.
Gregory Joseph Rosen, Attorney General's Office, Criminal Justice Division, William Berggren Collins, Attorney General's Office, Olympia, for Respondent.
FAIRHURST, J.
¶ 1 In 2006, this court directed the Indeterminate Sentence Review Board (ISRB) to redetermine the parolability of Richard J. Dyer after we concluded the ISRB supported its previous decision with speculation and conjecture. We ordered the ISRB to support its decision with objective facts. After the rehearing, the ISRB again determined Dyer was unparolable because he remained an untreated sex offender. We now consider Dyer's personal restraint petition (PRP) alleging the ISRB again abused its discretion and violated his constitutional rights. We hold the ISRB based its decision upon the objective fact that Dyer is an untreated sex offender and therefore did not abuse its discretion nor violate Dyer's constitutional rights. We affirm the ISRB.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 A jury convicted Dyer on two counts of first degree rape against two women, Ms. A and Ms. B. On January 27, 1980, Ms. A accepted a ride from two men in downtown Bremerton at 2:30 a.m. Ms. A sat in the front seat between the driver, who she later identified as Dyer, and a second man. When she realized Dyer was not driving to the designated destination, she attempted to grab the wheel and stomp on the brakes. Dyer forced her into the backseat where he subdued her with punches to the stomach. The second man drove the car to a remote location where Dyer undressed Ms. A. After the second man declined, Dyer raped Ms. A. Dyer then bound Ms. A with rope and held her to the rear floorboard while she was still naked.
¶ 3 The second man drove to a residence. Once inside, Dyer led Ms. A. to a bedroom where he tied her to a bed on her back. Dyer gagged her with cotton. The men also taped cotton over her eyes. The second man quickly raped Ms. A and was not seen or heard by her thereafter. Dyer applied contraceptive foam to Ms. A and proceeded to *763 rape her eight times throughout the night. At one point, Dyer flipped her from her back to her stomach and raped her in the new position. Twice she was untied and forced to bathe. In the morning, Dyer washed Ms. A's clothes, bathed, and dressed her. After rebinding her, Dyer drove Ms. A into the woods and released her.
¶ 4 Later that year, two men offered a ride to another woman, Ms. B, in downtown Bremerton around 11:00 p.m. Ms. B twice refused the offer while walking her dog. The car left but shortly reappeared and Ms. B was forced inside. En route to their destination, the driver who Ms. B later identified as Dyer paused to tape cotton balls over Ms. B's eyes.
¶ 5 The two men took Ms. B to a residence. Once inside, Ms. B was undressed and tied to a bed. After the second man left, Dyer applied contraceptive foam to Ms. B and raped her repeatedly. At one point, Dyer flipped her from her back to her stomach and raped her in the new position. Dyer forced Ms. B to shower with him. In the morning, he washed Ms. B's clothes, bathed, and dressed her. He then drove Ms. B to a park and released her. Prior to leaving, Dyer gave Ms. B a wristwatch that was later identified as the wristwatch Ms. A lost during her struggle in Dyer's car.
¶ 6 Based on these incidents, Dyer was convicted of two counts of first degree rape. In 1982, the court sentenced Dyer to two maximum terms of life imprisonment to run concurrently. By letter, the sentencing judge recommended Dyer "`should be held in custody until the Parole Board is absolutely sure that he will not reoffend or until the end of his natural life.'" App. to PRP, App. P at 1. The prosecuting attorney recommended a 50 year sentence. The ISRB designated Dyer's original minimum term at 600 months. However, in light of the adoption of the Sentencing Reform Act of 1981(SRA) guidelines, chapter 9.94A RCW, the ISRB reduced Dyer's minimum sentence to 240 months. This adjusted minimum exceeded the standard range of 63 to 88 months. However, the ISRB justified its deviation with the recommendations of the sentencing judge and the prosecuting attorney and the deliberate cruelty manifest in the underlying crimes.
¶ 7 Since his incarceration, the ISRB has determined Dyer not parolable five times. In 1994, the ISRB found Dyer not parolable based, in part, on a 1993 psychological evaluation that found Dyer's risk of reoffense was "very high" and his depth of sexual deviancy was "high." Resp. of the ISRB to PRP, App. 5, at 3. In 1995, the ISRB found Dyer not parolable and added 60 months to his minimum term. The ISRB based its decision in part on a 1994 psychological evaluation diagnosing Dyer with posttraumatic stress disorder (PTSD) and sexual sadism. It concluded, "without treatment, the risk of reoffense remains high." Id. App. 6, at 3. The ISRB noted that "Mr. Dyer is an untreated, convicted rapist who denies his culpability and is therefore not amenable or receptive to treatment." Id. In 1998, the ISRB again found Dyer not parolable and added 60 months to his minimum term.
¶ 8 Prior to Dyer's 2002 parole hearing, licensed mental health counselor Carson Carter conducted a new psychological evaluation of Dyer. On both the Minnesota Sex Offender Screening Tool  Revised and the Rapid Risk Assessment for Sexual Offense Recidivism, Dyer received low scores, which Carter described as "typical of sex offenders who present a low risk to reoffend." App. to PRP, App. C at 3. On the Hare Psychopath Checklist  Revised, Dyer received a very low score, indicating a low risk of committing another violent offense within six months after release from custody. Carter concluded that Dyer "could be considered for community supervision with less concern for the community than many of the offenders who are released into society." Id. at 4. Dyer's 2001 Department of Corrections (DOC) classification referral states that he completed several offender change programs, including anger/stress management, victim awareness, and nonviolent conflict resolution.
¶ 9 In 2002, the ISRB again found Dyer not parolable and added 60 months to his minimum term. The ISRB stated, "[a] central difficulty for the Board is that Mr. Dyer remains an untreated sex offender." Resp. of the ISRB to PRP, App. 11, at 3. The *764 ISRB noted that DOC's sex offender treatment program (SOTP) requires "full candor" and Dyer was not eligible for SOTP because he continued to maintain his innocence. Id.
¶ 10 However, the ISRB identified Dyer's potential to react poorly to stress the more "serious and significant" factor in its decision. Id. at 3. The ISRB considered evidence that Dyer was "an orderly person, careful in his work" but also acknowledged that "calculation" was "precisely the behavior demonstrated in the crimes." Id. The ISRB anticipated that, upon release, Dyer would face stress leading to a "potential reaction" acting as a "trigger to more attacks." Id. at 3-4. The ISRB also recognized that the risk of reoffense "appears to have been ameliorated in current psychological tests" but cited a concern that Dyer might have learned how to take psychological tests. Id. at 4. Based upon these concerns, the ISRB found that Dyer was "not rehabilitated" and therefore not parolable. Id.
¶ 11 Following the 2002 decision, Dyer filed a PRP that we transferred to the Court of Appeals. The Court of Appeals dismissed it, determining the ISRB had not abused its discretion nor violated Dyer's constitutional rights. Dyer filed a motion for discretionary review in this court, which the commissioner denied in an order dated April 13, 2005. Dyer filed a motion to modify the commissioner's ruling, and we subsequently granted that motion and Dyer's motion for discretionary review.
¶ 12 We determined the ISRB abused its discretion by supporting its parolability decision with "speculation and conjecture." In re Pers. Restraint of Dyer, 157 Wash.2d 358, 369, 139 P.3d 320 (2006) (Dyer I). We found the ISRB ignored the evidence favoring parole and "based its decision on unsupported notions that Dyer manipulated the psychological evaluations and poses a high risk of reoffense because of his good behavior in prison and the nature of his crimes." Id. at 368-69, 139 P.3d 320. We remanded the matter back to the ISRB with the mandate to make a decision based upon the "evidence and testimony" presented at the hearing. Id. at 369, 139 P.3d 320.
¶ 13 In October 2006, the ISRB conducted a new parolability hearing. Dyer reported that, as a result of therapy, many of his PTSD symptoms had diminished. The ISRB reviewed Dyer's psychological evaluations dating back to 1993. It highlighted the most recent evaluation dated February 2005 that assessed Dyer as a "low risk to reoffend sexually." App. to PRP, App. P at 10. However, the ISRB also observed that "the scoring tools utilized were not provided" with the psychological report. Id. The ISRB also considered two policy papers by the Washington State Institute for Public Policy. The first policy paper showed that the SOTP did not reduce participants' recidivism rates. The second policy paper showed that offenders who willingly participate in the program have lower recidivism rates than those who unwillingly participate in the program. The ISRB found that these reports had little applicability to Dyer since his "decision to not admit guilt necessarily results in an inability to participate in the SOTP." Id. at 11.
¶ 14 Based upon the evidence before it, the ISRB found Dyer unparolable because he is an untreated sex offender. "[W]ithout an exploration and understanding of the behaviors that directly resulted in his incarceration, he remains at risk to repeat those behaviors in the community." Id. at 12. The ISRB added 80 months to his minimum sentence raising it to 500 months.[1]
¶ 15 In March 2007, Dyer filed a PRP alleging the ISRB abused its discretion and violated his constitutional rights. We granted Dyer's motion to retain the PRP.

II. ISSUES

A. Whether the ISRB abused its discretion by finding Dyer not parolable.

B. Whether the ISRB decision violated Dyer's constitutional rights.

III. ANALYSIS
¶ 16 A petitioner must show he is under unlawful restraint to succeed on a *765 PRP challenge of an ISRB decision. RAP 16.4(b), (c); In re Pers. Restraint of Addleman, 151 Wash.2d 769, 774, 92 P.3d 221 (2004) (citing In re Pers. Restraint of Cashaw, 123 Wash.2d 138, 148-49, 866 P.2d 8 (1994)). Dyer argues the ISRB's abuse of discretion and constitutional violations create unlawful restraints.

A. Whether the ISRB abused its discretion by finding Dyer not parolable
¶ 17 The burden rests with the petitioner to prove the ISRB abused its discretion. Addleman, 151 Wash.2d at 776, 92 P.3d 221. Dyer alleges the ISRB abused its discretion in three ways.

1. Whether the ISRB may deny parole due to failure to complete the SOTP

¶ 18 The ISRB abuses its discretion when it "fails to follow its own procedural rules for parolability hearings or acts without consideration of and in disregard of the facts." Dyer I, 157 Wash.2d at 363, 139 P.3d 320 (citing Addleman, 151 Wash.2d at 776-77, 92 P.3d 221). Reliance upon "speculation and conjecture" with disregard of the evidence also constitutes an abuse of discretion. Id. at 369, 139 P.3d 320. We must find the ISRB acted willfully and unreasonably to support a determination that the parolability decision is arbitrary and capricious. Ben-Neth v. Indeterminate Sentence Review Bd., 49 Wash.App. 39, 42, 740 P.2d 855 (1987) (citing In re Buffelen Lumber & Mfg. Co., 32 Wash.2d 205, 209, 201 P.2d 194 (1948)), overruled on other grounds by Shoreline Cmty. Coll. Dist. No. 7 v. Employment Sec. Dep't, 120 Wash.2d 394, 842 P.2d 938 (1992).
¶ 19 Dyer argues the ISRB abused its discretion by basing its decision upon the fact that Dyer has not completed the SOTP. Participation in the SOTP requires an inmate to admit his or her guilt in order to participate. However, Dyer is unable to participate because he maintains he is innocent of the crimes for which he was convicted. Dyer claims this court prohibited the ISRB from basing its decision upon his lack of treatment. This is an inaccurate statement of our holding in Dyer I.
¶ 20 In Dyer I, we faulted the ISRB for justifying its decision with "speculation and conjecture."[2] 157 Wash.2d at 369, 139 P.3d 320. Specifically, we assigned error to the ISRB's reliance upon "unsupported notions that Dyer manipulated the psychological evaluations and poses a high risk of reoffense because of his good behavior in prison and the nature of his crimes." Id. We ordered the ISRB to conduct a new parolability hearing and base its decision on the evidence and testimony presented. We did not preclude the ISRB from considering the fact that Dyer has not gone through the SOTP.
¶ 21 The question remaining from Dyer I is whether the ISRB supported its decision with objective facts and in consideration of the evidence before it. Id. The ISRB decision shows it considered Dyer's psychological evaluations including the most recent 2005 evaluation that assessed Dyer as a "low risk to reoffend sexually." App. to PRP, App. P at 10. However, the ISRB noted the evaluation did not provide the "scoring tools utilized." Id. The ISRB also considered policy papers[3] showing that participation in the SOTP was not correlated to lower rates of *766 recidivism. The ISRB discounted the applicability of these findings given that Dyer's "decision to not admit guilt necessarily results in an inability to participate in the SOTP." Id. at 11.
¶ 22 In short, the ISRB was "faced with an inmate who has been convicted of multiple violent sexual assaults, who is an untreated sex offender who has not demonstrated any insight into the criminal behavior that resulted in his convictions." Id. at 8. The ISRB commended Dyer for his "self-improvement work" but stated, "without an exploration and understanding of the behaviors that directly resulted in his incarceration, he remains at risk to repeat those behaviors in the community." Id. at 12. Therefore, in consideration of all the evidence presented, the ISRB based its parolability decision upon the objective fact that Dyer is an untreated sex offender.
¶ 23 Furthermore, settled law establishes that the ISRB may consider the offender's failure to obtain treatment. Lack of rehabilitation is a permissible reason to impose a minimum sentence considered exceptional under the SRA guidelines. In re Pers. Restraint of Ecklund, 139 Wash.2d 166, 176, 985 P.2d 342 (1999). By statute, the ISRB must deny parole if the inmate is unrehabilitated or otherwise unfit for release. RCW 9.95.100. We have adopted the position that "the first step toward rehabilitation is `the offender's recognition that he was at fault.'" Ecklund, 139 Wash.2d at 176, 985 P.2d 342 (quoting Gollaher v. United States, 419 F.2d 520, 530 (9th Cir.1969)). Accordingly, the ISRB may base its decision to deny parole, in part, upon the fact that the offender refuses treatment that requires him or her to take responsibility for criminal behavior.[4]Id. at 177, 985 P.2d 342. Similarly here, Dyer has not taken responsibility for his crimes which prevents him from obtaining the treatment the ISRB deems necessary for his full rehabilitation. Therefore the ISRB acted within its discretion to deny Dyer parole.

2. Whether Dyer's sentence was excessive

¶ 24 Dyer next argues the ISRB abused its discretion by failing to make his sentence reasonably consistent with the standard ranges set forth in the SRA. The ISRB may abuse its discretion if it fails to consider the sentencing ranges delineated in the SRA. Addleman, 151 Wash.2d at 776-77, 92 P.3d 221 (citing In re Pers. Restraint of Locklear, 118 Wash.2d 409, 418, 823 P.2d 1078 (1992)). However, the expiration of an inmate's minimum term does not compel his release but, rather, designates a date certain whereby the ISRB will reevaluate the inmate's parolability. Cashaw, 123 Wash.2d at 143, 866 P.2d 8 (citing In re Pers. Restraint of Powell, 117 Wash.2d 175, 186 n. 1, 814 P.2d 635 (1991)); WAC 381-40-100.
¶ 25 Dyer claims that the ISRB's actions contradict this court's construction of RCW 9.95.009(2) in Addleman. RCW 9.95.009(2) provides the ISRB must "consider the purposes, standards, and sentencing ranges" outlined in the SRA as well as the "minimum term recommendations of the sentencing judge and prosecuting attorney." The ISRB must also "attempt to make decisions reasonably consistent with those ranges, standards, purposes, and recommendations" and provide an adequate written explanation when it deviates from the SRA guidelines. Id.
¶ 26 RCW 9.95.100, however, also requires the ISRB to not release a prisoner until he or she is fully rehabilitated. The ISRB "shall not, however, until his or her maximum term expires, release a prisoner, unless *767 in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release." Id. Weighing the import of these statutory provisions, the Addleman court determined the ISRB's duty to not release an unrehabilitated prisoner "trumps" its duty to attempt reasonable consistency with the SRA. 151 Wash.2d at 775, 92 P.3d 221.
¶ 27 The ISRB noted in its recent decision it was "statutorily required to give public safety considerations the highest priority." App. to PRP, App. P at 7 (citing RCW 9.95.009(3)).[5] Consonant with Addleman, the ISRB stated it was not allowed to release a prisoner "before the expiration of their maximum term, unless in its opinion his or her rehabilitation has been complete." Id. (citing RCW 9.95.100). As discussed earlier, the ISRB concluded Dyer failed to demonstrate complete rehabilitation as he remained an untreated sex offender. Based on these facts, we hold the ISRB followed its statutory mandate to consider public safety and properly declined to release Dyer.
¶ 28 The ISRB must also make its minimum sentences reasonably consistent with the recommendations of the sentencing judge and prosecuting attorney. RCW 9.95.009(2). As noted in the ISRB decision, the sentencing judge recommended Dyer "should be held in custody until the Parole Board is absolutely sure that he will not reoffend or until the end of his natural life" while the prosecuting attorney recommended a 50 year (600 month) minimum sentence. App. to PRP, App. P at 1-2 (internal quotation marks omitted). In 2006, the ISRB added 80 months to Dyer's sentence raising his minimum term to a total of 500 months.[6] While this term is significantly above the SRA standard range for first degree rape, it does fall within the ranges recommended by the sentencing judge and prosecuting attorney.
¶ 29 Given that the ISRB deviated from the SRA, the court must determine whether the ISRB supplied "adequate written reasons." RCW 9.95.009(2). "Adequate written reasons" implies the ISRB first consulted the SRA standard ranges, found them inappropriate, and recorded its reasoning. Locklear, 118 Wash.2d at 419, 823 P.2d 1078. In Locklear, the court found the ISRB did not provide adequate written reasons to support its denial of parole where it made no indication it consulted the SRA ranges or the recommendation from the sentencing judge but only referred to the prosecuting attorney's recommendation. Id. In Ecklund, the court found the ISRB provided adequate written reasons to support its imposition of what would be considered an exceptional minimum term under the SRA when it considered and articulated factors for why Ecklund was not rehabilitated. 139 Wash.2d at 177 n. 10, 985 P.2d 342. Specifically, the court approved of the ISRB's consideration of Ecklund's failure to admit his guilt given that it prevented him from obtaining appropriate rehabilitative treatment. Id. at 177, 985 P.2d 342.
¶ 30 Here, the ISRB referenced the SRA standard range sentence for first degree rape as well as the recommendations of the sentencing judge and prosecuting attorney. The ISRB also observed that Dyer maintains his innocence which prevents him from participating in the SOTP. Consequently, the ISRB found Dyer was not rehabilitated because "without an exploration and understanding of the behaviors that directly resulted in his incarceration, he remains at risk to repeat those behaviors in the community." App. to PRP, App. P at 12. Under both Locklear and Ecklund, the ISRB provided adequate written reasons to support its imposition of an exceptional minimum sentence.

3. Whether the ISRB improperly considered Dyer's convictions

¶ 31 Dyer argues that the ISRB abused its discretion by considering the facts underlying *768 his convictions. In Dyer I, the ISRB erroneously relied upon the nature of Dyer's crimes to assess his recidivism risk. 157 Wash.2d at 368, 139 P.3d 320 ("[T]he ISRB dismissed evidence of Dyer's rehabilitation in prison evidently based on the facts of his underlying crimes."). Here, the ISRB did not base its parolability decision on the nature of Dyer's crimes. Rather, it discussed the fact that Dyer was convicted to explain why it cannot use his denial of culpability to establish parolability. "Despite Mr. Dyer's protestations of innocence, however, it is not within this Board's jurisdiction to retry cases or to adjudicate guilt or innocence of those offenders under its jurisdiction." App. to PRP, App. P at 7. Unlike its previous decision, the ISRB did not inappropriately consider the facts underlying his convictions to predict his likelihood to reoffend.

4. Remedy

¶ 32 Dyer argues that, if this court were to find the ISRB abused its discretion, the court should reverse the ISRB's decision and order his parole. However, we do not find that the ISRB abused its discretion and therefore we do not reach this issue.

B. Whether the ISRB violated Dyer's constitutional rights
¶ 33 Dyer claims the ISRB violated his federal constitutional rights under the ex post facto clause, equal protection clause, due process clause, and Eighth Amendment's prohibition against cruel and unusual punishment. To succeed on these challenges, Dyer must demonstrate that constitutional error caused him actual harm by a preponderance of the evidence. In re Pers. Restraint of Stanphill, 134 Wash.2d 165, 169, 949 P.2d 365 (1998) (citing Powell 117 Wash.2d at 184, 814 P.2d 635).

1. Ex post facto

¶ 34 Dyer claims that the ISRB's reliance upon RCW 9.95.009(2) and (3) violates the ex post facto clause of the United States Constitution. This clause prohibits the State from enacting laws that retroactively increase the punishment associated with a crime after its commission. State v. Pillatos, 159 Wash.2d 459, 475, 150 P.3d 1130 (2007); U.S. CONST. art. I, § 10, cl. 1. The ex post facto clause is rooted in the individual's right to fair notice, not a right to less punishment. Pillatos, 159 Wash.2d at 475, 150 P.3d 1130 (citing Powell, 117 Wash.2d at 184-85, 814 P.2d 635 (citing Weaver v. Graham, 450 U.S. 24, 30, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981))).
¶ 35 That new procedures could result in a higher sentence for a prisoner does not establish an ex post facto violation. Id. at 476, 150 P.3d 1130 (citing Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). Instead, the court assesses whether the new law "`(1) is substantive [or] merely procedural; (2) is retrospective (applies to events which occurred before its enactment); and (3) disadvantages the person affected by it.'" Id. (alteration in original) (quoting Powell, 117 Wash.2d at 185, 814 P.2d 635). In the criminal context, "`disadvantage'" means "`the statute alters the standard of punishment which existed under the prior law.'" Id. (quoting State v. Schmidt, 143 Wash.2d 658, 673, 23 P.3d 462 (2001)). Dyer contends he is disadvantaged by the ISRB's application of RCW 9.95.009(2) and (3).
¶ 36 Dyer asserts, "[i]f the Board is permitted to repeatedly deny parole based on the facts of the crime, however, then RCW 9.95.009(2) works only to the detriment of prisoners." PRP at 46. However, on balance, RCW 9.95.009(2) works to the advantage of offenders by guaranteeing a parole hearing upon the expiration of his or her minimum term. Powell, 117 Wash.2d at 191, 814 P.2d 635. In addition, the statute worked to the advantage of Dyer when the ISRB adjusted his original minimum term from 600 months to 240 months.
¶ 37 Furthermore, a petitioner must definitively show that the change in law resulted in a harsher sentence. Stanphill, 134 Wash.2d at 173, 949 P.2d 365. Speculative assertions do not satisfy the petitioner's burden. Id. Dyer fails to show with any certainty that RCW 9.95.009(2) led to a harsher sentence, and we reject his ex post facto argument regarding RCW 9.95.009(2).
*769 ¶ 38 Dyer next argues the ISRB's reliance upon RCW 9.95.009(3) is an ex post facto violation. He claims the statute increased the weight assigned to public safety considerations which created a substantial risk that offenders will serve longer sentences. He urges the court to reject In re Personal Restraint of Haynes, 100 Wash. App. 366, 996 P.2d 637 (2000), which held RCW 9.95.009(3) was not an ex post facto law as applied to Haynes. Id. at 378, 996 P.2d 637. The Court of Appeals reasoned under previous law, RCW 9.95.100, the ISRB was allowed to emphasize public safety considerations in its decision making. Id. We agree.
¶ 39 The purpose of the ex post facto clause is to provide fair warning. Pillatos, 159 Wash.2d at 475, 150 P.3d 1130. RCW 9.95.009(3) is not an ex post facto law since public safety considerations have always constrained the ISRB's parolability determinations. Dyer had fair notice of this parolability factor, and therefore his ex post facto argument fails.

2. Equal protection

¶ 40 Dyer next argues the ISRB violated the federal equal protection clause in two respects. First, he claims the ISRB's failure to make his sentence reasonably consistent with the SRA under RCW 9.95.009(2) constitutes unlawful discrimination as a pre-SRA offender. However, it is well settled "[t]here is no denial of equal protection in having persons sentenced under one system for crimes committed before July 1, 1984 and another class of prisoners sentenced under a different system." Foster v. Wash. State Bd. of Prison Terms & Parole, 878 F.2d 1233, 1235 (9th Cir.1989); Addleman, 151 Wash.2d at 774, 92 P.3d 221. Furthermore, as previously discussed, we find the ISRB fully complied with RCW 9.95.009(2), and therefore Dyer's argument fails.
¶ 41 Second, Dyer asserts the ISRB denied him equal treatment by conditioning his parolability upon a factor beyond his control  his eligibility to participate in the SOTP.[7] He cites Ohlinger v. Watson, 652 F.2d 775 (9th Cir.1980), for the proposition that the ISRB may not deny parole based on programs the inmate cannot obtain. Dyer's circumstances are factually distinguishable from Ohlinger.
¶ 42 Ohlinger held persons given indeterminate sentences "on the basis of a mental illness" have a constitutional right to adequate treatment for their mental infirmity. 652 F.2d at 777 n. 5 (emphasis added). Dyer, however, was not incarcerated due to a mental illness and the SOTP is available to Dyer if he takes responsibility for his crimes. Dyer's equal protection argument fails.

3. Void for vagueness

¶ 43 Dyer next argues that RCW 9.95.009(2) as applied to him is void for vagueness because his sentence is not reasonably consistent with the SRA standard range. Mere uncertainty regarding the application of the statute to purportedly prohibited conduct does not establish vagueness. State v. Watson, 160 Wash.2d 1, 7, 154 P.3d 909 (2007). Rather, "[t]he test is whether men of reasonable understanding are required to guess at the meaning of the statute." In re Pers. Restraint of Myers, 105 *770 Wash.2d 257, 267, 714 P.2d 303 (1986) (citing City of Seattle v. Rice, 93 Wash.2d 728, 731, 612 P.2d 792 (1980)).
¶ 44 Dyer acknowledges this court has already rejected a vagueness challenge regarding RCW 9.95.009(2). In Myers we found "[t]he Legislature intended that the Board consider and impose sentences reasonably consistent with the SRA. Reasonable persons need not guess at the meaning of the challenged provision." 105 Wash.2d at 268, 714 P.2d 303. Accordingly, we held RCW 9.95.009(2) was not void for vagueness. Id.
¶ 45 Furthermore, we assess vagueness in light of other statutes, which are "`[p]resumptively available to all citizens'." Watson, 160 Wash.2d at 8, 154 P.3d 909 (alteration in original) (internal quotation marks omitted) (quoting City of Spokane v. Douglass, 115 Wash.2d 171, 180, 795 P.2d 693 (1990)). RCW 9.95.009(3) and .100 make it clear the ISRB may not release an inmate unless it finds him or her completely rehabilitated notwithstanding its obligations under RCW 9.95.009(2).[8] The ISRB determined Dyer is not rehabilitated and, therefore, in accord with its statutory mandate, denied Dyer parole. As applied to Dyer, RCW 9.95.009(2) is not unconstitutionally vague.

4. Substantive due process

¶ 46 Executive action that shocks the court's conscience violates substantive due process. Braam v. State, 150 Wash.2d 689, 700, 81 P.3d 851 (2003). Dyer contends that the ISRB's repeated denials of parole "shock the conscience" in violation of substantive due process under the federal constitution. PRP at 47 (citing Hunterson v. DiSabato, 308 F.3d 236, 248 (3d Cir.2002)). He asserts "there is absolutely nothing he can do to be paroled." PRP at 48. The ISRB decision does not support Dyer's contention. The ISRB did not indicate Dyer was powerless to gain release but rather declined to release an untreated sex offender. This reasoning does not shock the conscience, and therefore we reject Dyer's substantive due process argument.

5. Cruel and unusual punishment

¶ 47 Dyer claims it is cruel and unusual punishment under the Eighth Amendment to the United States Constitution and under article I, section 14 of the state constitution to give him false hope of parole every five years when the ISRB intends to deny his parole every time. The record does not support Dyer's assessment. The ISRB did not state it intended to hold Dyer indefinitely, and we are not in a position to predict the ISRB's future decisions. We decline to review this issue where the evidence in the record does not support Dyer's conclusory argument. In re Pers. Restraint of Williams, 111 Wash.2d 353, 364, 759 P.2d 436 (1988) (holding that petitioner's constitutional arguments failed where they are not grounded in facts and are merely conclusory allegations).

IV. CONCLUSION
¶ 48 The burden rests with the inmate to prove he is a fit subject for release. We hold Dyer failed to demonstrate his complete rehabilitation, and the ISRB did not abuse its discretion by adding 80 months to his minimum term. We also hold the ISRB properly adhered to its statutory mandate to make public safety its paramount consideration and did not violate Dyer's constitutional rights.
¶ 49 We affirm the decision of the ISRB.
MADSEN, OWENS, J. JOHNSON, JJ., and BRIDGE, J.P.T., concur.
SANDERS, J. (dissenting).
¶ 50 In In re the Personal Restraint of Dyer, 157 Wash.2d 358, 139 P.3d 320 (2006), *771 we reversed the Indeterminate Sentence Review Board's (ISRB) 2002 denial of parole because "a review of the evidence and testimony presented at the parolability hearing suggests Dyer met his burden to have conditions of release on parole established...." Id. at 369, 139 P.3d 320. On remand the ISRB was ordered to "make its determination based on the evidence and testimony presented, and not on speculation and conjecture." Id. But today's new majority ignores the prior considered judgment of the court to hold the ISRB may justify denial of Richard Dyer's parole simply because he is an untreated sex offender. Majority at 766 ("[T]he ISRB based its parolability decision upon the objective fact that Dyer is an untreated sex offender.").
¶ 51 In other words a majority of this court previously held Dyer met his burden to have conditions of parole established notwithstanding his status as an untreated sex offender, but now the new majority ignores our prior case (without overruling it), claiming Dyer's status as an untreated sex offender is an "objective fact" (as it was equally so before). Id.; see also Dyer, 157 Wash.2d at 386, 139 P.3d 320 (Fairhurst, J., dissenting) (arguing "[t]he ISRB did not abuse its discretion when it determined that Dyer was not parolable because he was an untreated violent sex offender").
¶ 52 Certainly that Dyer is not allowed to participate in sex offender treatment only because he maintains his innocence is also an objective fact. To require Dyer to admit guilt as a precondition to parole violates equal protection, substantive due process, and the doctrine of unconstitutional conditions.
¶ 53 Although the factual circumstances of the original charged offense are generally irrelevant to a principled and reasoned analysis of the legal issue regarding parolability, see Dyer, 157 Wash.2d at 368, 139 P.3d 320; the majority and the ISRB apparently detail the factual circumstances of Dyer's offense to bolster their case against parole. See majority at 762-63; App. P to Pers. Restraint Pet. (Pers. Restraint Pet.App.) at 3-6. Some additional facts follow.
¶ 54 Dyer was convicted of the 1980 rape of two women. Dyer became a suspect a year after the rapes were committed and after Dyer's ex-wife reported to police Dyer raped her in a similar manner a year earlier. Dyer was tried and convicted of all three rapes; however, Dyer's conviction for the alleged rape of his ex-wife was reversed by the Court of Appeals. Although he was never retried for allegedly raping his ex-wife, the ISRB apparently still treats this reversed conviction as additional grounds to deny parole. Pers. Restraint Pet.App. P at 3 (ISRB's announcement of decision and reasons stating, "[b]ecause these convictions were overturned on a technicality, he was not found innocent of them.").[1]
¶ 55 At trial doctors testified they found semen in the two raped women. However, no DNA (deoxyribonucleic acid) test was performed on the semen to see whether it came from Dyer. When in 2001 Dyer requested DNA testing he was told the samples had been destroyed.
¶ 56 Dyer was convicted largely on the testimony of the two alleged victims.[2] The first victim testified the rapist was five feet, two or three inches tall, no mustache, lived on a gravel road, and drove a Mercury Comet. Dyer, however, is five feet seven inches tall, wore a mustache, lived in a house with an asphalt paved drive, and drove a Mercury Meteor. The second victim originally told police she would be unable to identify her rapist, but at trial 16 months later she identified Dyer after seeing him led into the courtroom in handcuffs between two policemen.
¶ 57 Although a jury found Dyer guilty of rape, Dyer has consistently maintained his innocence. With the destruction of all the DNA evidence, the question of Dyer's innocence *772 will likely never be reexamined; yet we should not ignore the possibility. See Baze v. Rees, 553 U.S. ___, 128 S.Ct. 1520, 1551, 170 L.Ed.2d 420 (2008) (Stevens, J., concurring) ("[A]bundant evidence accumulated in recent years has resulted in the exoneration of an unacceptable number of defendants found guilty of capital offenses." (citing Brandon L. Garrett, Judging Innocence, 108 COLUM. L.REV. 55 (2008); D. Michael Risinger, Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate, 97 J. CRIM. L. & CRIMINOLOGY 761 (2007))).
¶ 58 This is not to suggest the ISRB may readjudicate the guilt of each prisoner before it, but it is to suggest knee-jerk denial of parole based on claims of innocence is inappropriate for reasons including the distinct possibility the prisoner is factually innocent.[3] Daniel S. Medwed, The Innocent Prisoner's Dilemma: Consequences of Failing to Admit Guilt at Parole Hearings, 93 IOWA L.REV. 491 (2008) (analyzing the fault of requiring admission of guilt as a predicate to parole). Despite Dyer's claim of innocence, or perhaps because of it, he has been a role model for other prisoners.
¶ 59 Throughout his incarceration Dyer has maintained his role as husband, father, and financial provider to his family. Dyer's wife credits him with encouraging her move from public assistance to a career as a registered obstetrical nurse. Dyer's children credit their father for providing a united and supporting environment despite the obvious hardships. Dyer provides financially for his family by running a real estate business from prison.
¶ 60 Dyer's prison work history is exemplary. He has not committed a serious prison infraction since 1995, and his last infraction of any kind was in 1999. Moreover, Dyer is a facilitator for Alternatives to Violence, a mediation/resolution program, and assists inmates with posttraumatic stress disorder issues.
¶ 61 To date Dyer has completed the following rehabilitation programs: Anger/Stress Management, Victim Awareness, Non-Violent Conflict Resolution, Moral Reconation Therapy, Industrial Therapy, Restorative Retelling Story Group, Family Dynamics, and Love and Forgiveness Couples Seminar. Dyer requested enrollment in sex offender treatment, personally writing a letter to the program, but his request was denied because he maintains his innocence.[4]
¶ 62 Lastly, every psychological evaluation of Dyer since 2001 indicates he is an appropriate candidate for parole. Yet the ISRB denies Dyer parole.

A. The ISRB abused its discretion by denying parole based on unsupported reasoning
¶ 63 An ISRB decision is reviewed under an abuse of discretion standard. See e.g., Dyer, 157 Wash.2d at 363, 139 P.3d 320. The ISRB abuses its discretion when it fails to consider or disregards the facts and evidence presented. Id. at 369, 139 P.3d 320.
¶ 64 To reach its decision the ISRB cited two recent studies by the Washington State Institute for Public Policy to support denial of Dyer's application of parole as an untreated sex offender.[5] These studies do indeed *773 highlight the relevancy of Dyer's participation in sex offender treatment.[6]
¶ 65 The first study demonstrates sex offenders who participate in sex offender treatment programs have a higher recidivism rate than those offenders who were willing, but unable, to participate. The second study demonstrates recidivism rates for sex offenders who were not willing to participate in sex offender treatment were significantly higher than those who were willing to participate.
¶ 66 The ISRB claims Dyer's refusal to admit guilt demonstrates his unwillingness to participate in the program. However, this court has already recognized Dyer's willingness to participate in any program available to him. Dyer, 157 Wash.2d at 364, 139 P.3d 320. Moreover, the methodology of both reports places Dyer squarely in the category of willing to participate but rejected by the program.[7] Therefore, according to the very studies relied upon by the ISRB, Dyer has a lower projected recidivism rate than a sex offender who actually undertakes sex offender treatment.[8]
¶ 67 A refusal to admit guilt may be relevant to the question of rehabilitation; however, it cannot be the sole basis to deny parole. In re Pers. Restraint of Ecklund, 139 Wash.2d 166, 176-77, 985 P.2d 342 (1999).[9] Nor can the ISRB lawfully withhold parole because Dyer has not confessed. Id. at 177, 985 P.2d 342 ("[T]he Board may not demand that Ecklund confess to the murder in order to obtain parole...."). Yet that is exactly what the ISRB, and the majority, require of Dyer. The only way for Dyer to be eligible for sex offender treatment, and therefore parole, is to confess.
¶ 68 Yet no objective evidence links Dyer's claim of innocence to lack of rehabilitation. To the contrary, "[t]he evidence presented to the ISRB supports the argument that Dyer currently poses a low risk of reoffending." Dyer, 157 Wash.2d at 366, 139 P.3d 320.
¶ 69 Since our decision in Dyer the new information presented to the ISRB was entirely favorable to Dyer. Moreover, considering the obvious disincentive to claim innocence, logic dictates Dyer's repeated assertions of innocence exemplify his personal integrity, not his lack of rehabilitation.[10]
¶ 70 Dyer's rehabilitation is proved. The ISRB's decision is contrary to the evidence presented and an abuse of its discretion. Id. at 369, 139 P.3d 320.

B. The ISRB abused its discretion by imposing an exceptional minimum sentence without adequate reasons
¶ 71 When setting minimum terms the ISRB's decision must be "reasonably consistent *774 with the ranges, standards, purposes" of the Sentencing Reform Act of 1981(SRA), chapter 9.94A RCW, "and the minimum term recommendations of the sentencing judge and the prosecuting attorney...." RCW 9.95.013; see also RCW 9.95.009(2). The ISRB "shall not, however, until his or her maximum term expires, release a prisoner, unless in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release." RCW 9.95.100. "[B]etween a statutory requirement that a prisoner is not to be released until rehabilitation is complete and a duty to attempt consistency with the SRA, the statutory requirement trumps the duty to attempt. The two duties, however, are not mutually exclusive but can be exercised in harmony with each other." In re Pers. Restraint of Addleman, 151 Wash.2d 769, 775, 92 P.3d 221 (2004).
¶ 72 Though the ISRB is not bound to the duty of consistency, the legislature nevertheless bound the ISRB to the duty of providing "adequate written reasons whenever a minimum term or parole release decision is made which is outside the sentencing ranges adopted" under the SRA. RCW 9.95.009(2). The ISRB's "reasons for an exceptional sentence must be apparent from the record and not chosen `out of thin air.'" In re Pers. Restraint of Locklear, 118 Wash.2d 409, 417, 823 P.2d 1078 (1992) (quoting In re Pers. Restraint of Robles, 63 Wash.App. 208, 218, 817 P.2d 419 (1991)); see also In re Pers. Restraint of Myers, 105 Wash.2d 257, 266, 714 P.2d 303 (1986) (holding "imposition of a 48-month [exceptional] sentence in the absence of adequate reasons constituted an abuse of discretion.").
¶ 73 "Absent exceptional circumstances and written reasons justifying departure, the Board's minimum term decisions under section.009(2) must conform to the SRA." In re Pers. Restraint of Powell, 117 Wash.2d 175, 187, 814 P.2d 635 (1991) (emphasis added) (citing Addleman v. Board of Prison Terms & Paroles, 107 Wash.2d 503, 511, 730 P.2d 1327 (1986)). The length of the exceptional sentence must be proportionate to the reasons given by the ISRB. Locklear, 118 Wash.2d at 417, 823 P.2d 1078. These requirements ensure sufficient oversight of ISRB decisions. Id. at 418, 823 P.2d 1078; Myers, 105 Wash.2d at 262, 714 P.2d 303 (observing "the clear limitation imposed on the Board's discretion by RCW 9.95.009(2)").
¶ 74 To comply with RCW 9.95.009(2) the ISRB must provide adequate reasons to justify imposing an exceptional minimum term sentence, and the departure from the standard sentence must be proportionate to its reasoning. Even though the ISRB may not release a prisoner until in its opinion the prisoner is rehabilitated, its opinion is not sacrosanct, and the more the minimum sentence departs from the SRA standard range the more justification is required.[11]
¶ 75 Here the ISRB added another 80 months to Dyer's continually enhanced minimum sentence, bringing his minimum sentence to 500 months. The standard range sentence under the SRA for Dyer's crimes is 63 to 88 months. Dyer's minimum sentence is therefore 412 months in excess of the top of the SRA standard range. The ISRB has not provided adequate reasons for this exceptional sentence.
¶ 76 The ISRB commended Dyer on his self-improvement but stated that until Dyer admits his guilt "`he remains at risk to repeat those behaviors in the community.'" Majority at 766 (quoting Pers. Restraint Pet. App. P at 10). In other words, until Dyer confesses he will not be released.
¶ 77 As discussed above, nothing in the record links Dyer's refusal to admit guilt to a higher risk of reoffending. To the contrary, both studies by the Washington State Institute for Public Policy support the conclusion of Dyer's presenting a lower risk of reoffending *775 than sex offenders who have admitted guilt and undertaken the program the ISRB demands of them.
¶ 78 Moreover, Dyer's recent psychological evaluations show he poses a low recidivism risk.[12] Since the record fails to demonstrate any connection between Dyer's refusal to admit his guilt and an increased recidivism risk, the ISRB has provided inadequate reasons to justify the imposition of an exceptional sentence exponentially beyond the SRA standard range.

C. The ISRB violated Dyer's constitutional rights
¶ 79 "`There is no iron curtain drawn between the Constitution and the prisons of this country.'" State v. Hartzog, 96 Wash.2d 383, 391, 635 P.2d 694 (1981) (quoting Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

1. ISRB violated Dyer's equal protection rights
¶ 80 The majority inadequately analyzes Dyer's equal protection argument. The essence of Dyer's argument is the ISRB denied him equal treatment when it classified him as unrehabilitated simply because he has not been allowed to participate in sex offender treatment.
"The equal protection clauses of the Fourteenth Amendment to the United States Constitution and Const. art. I, § 12 `require that "`persons similarly situated with respect to the legitimate purpose of the law receive like treatment.'"' State v. Schaaf, 109 Wash.2d 1, 17, 743 P.2d 240 (1987) (quoting State v. Phelan, 100 Wash.2d 508, 512, 671 P.2d 1212 (1983) (quoting Harmon v. McNutt, 91 Wash.2d 126, 130, 587 P.2d 537 (1978))). One of three tests may be used to determine whether this clause has been violated. First, the strict scrutiny test applies when a classification affects a suspect class or a fundamental right. Schaaf, at 17, 743 P.2d 240.... Second, the intermediate scrutiny test may apply `in limited circumstances': the Supreme Court has applied this test for gender-based classifications; this court has applied intermediate scrutiny to classifications affecting `both an important right (the right to liberty) and a semi-suspect class not accountable for its status (the poor).' Schaaf, at 18, 743 P.2d 240.... Third, under the rational relationship test, `a law is subjected to minimal scrutiny and will be upheld "`unless it rests on grounds wholly irrelevant to the achievement of a legitimate state objective.'"' Schaaf, at 17, 743 P.2d 240 (quoting Phelan, at 512, 671 P.2d 1212 (quoting Nielsen v. Washington State Bar Ass'n, 90 Wash.2d 818, 820, 585 P.2d 1191 (1978)))."
State v. Heiskell, 129 Wash.2d 113, 123-24, 916 P.2d 366 (1996) (alterations in original) (quoting Westerman v. Cary, 125 Wash.2d 277, 294-95, 892 P.2d 1067 (1994)).
¶ 81 Prisoners are neither a suspect nor a semisuspect classification, so the rational basis test applies.
"Under the rational basis test, a statute is constitutional if (1) the legislation applies alike to all persons within a designated class; (2) reasonable grounds exist for distinguishing between those who fall within the class and those who do not; and (3) the classification has a rational relationship to the purpose of the legislation. The classification must be `purely arbitrary' to overcome the strong presumption of constitutionality applicable here."
Westerman, 125 Wash.2d at 295, 892 P.2d 1067 (quoting State v. Smith, 117 Wash.2d 263, 279, 814 P.2d 652 (1991)).
¶ 82 The ISRB classified Dyer as unrehabilitated because he has not participated in sex offender treatment. Classifying Dyer as unrehabilitated based on the fulfillment of treatment whose participants have a projected higher recidivism rate than those who are willing but unable to participate is not rationally related to the legitimate state objective *776 of requiring rehabilitation prior to parole, especially in light of Dyer's documented rehabilitation, low recidivism risk, and model prisoner behavior.

2. ISRB's decision shocks the judicial conscious
The test for whether a particular action shocks the conscience must be appropriately tailored to the factual context at hand and "must be determined by balancing ... liberty interests against the relevant state interests." Youngberg [v. Romeo], 457 U.S. [307,] 321[, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ]. In order to preserve "constitutional proportions of substantive due process," a court must undertake "an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." [County of Sacramento v.] Lewis, 523 U.S. [833,] 850[, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ].
Braam ex rel. Braam v. State, 150 Wash.2d 689, 704, 81 P.3d 851 (2003).
¶ 83 The ISRB demands Dyer admit guilt to undergo sex offender treatment before it will consider granting him parole. Not only is the ISRB's demand not statutorily justified, see Ecklund, 139 Wash.2d at 177, 985 P.2d 342 (stating, "the Board may not demand that Ecklund confess to the murder in order to obtain parole"), but it shocks the judicial conscience.
¶ 84 The ISRB's reasoning presents a catch-22: a factually innocent person must admit to being a criminal in order to reenter free society; yet admitting to the crime forecloses any opportunity the factually innocent prisoner may have to clear his name. This shocks the judicial conscience in light of Dyer's documented rehabilitation, low recidivism risk, model prisoner behavior, and continued maintenance of his responsibilities to his wife and children.

3. The ISRB's decision violates the doctrine of unconstitutional conditions
¶ 85 Under the doctrine of unconstitutional conditions, the government cannot condition the receipt of its benefits upon the nonassertion of a constitutional right, even if the benefit is merely a privilege.[13] As articulated by the United States Supreme Court:
[T]he power of the state in that [ability to deny a privilege or benefit altogether] is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence.
Frost & Frost Trucking Co. v. R.R. Comm'n of Cal. 271 U.S. 583, 593-94, 46 S.Ct. 605, 70 L.Ed. 1101 (1926); see also Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (stating a state may not indirectly "produce a result which the State could not command directly"); Sherbert v. Verner, 374 U.S. 398, 404 n. 6, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (citing cases "for examples of conditions and qualifications upon governmental privileges and benefits which have been invalidated because of their tendency to inhibit constitutionally protected activity").
¶ 86 Dyer does not have a protected liberty interest in early release. See, e.g., In re Pers. Restraint of Ayers, 105 Wash.2d 161, 164-66, 713 P.2d 88 (1986). However, the absence of a protected liberty interest is not dispositive of the question whether the state may constitutionally condition the privilege of parole on self-incrimination. See State v. Imlay, 249 Mont. 82, 813 P.2d 979 (1991).
¶ 87 The question presented in Imlay was remarkably similar to the one here: Whether an inmate could be compelled, as a prerequisite to admission in a sexual therapy program, *777 to admit guilt where completion of such a program was required in order to allow him to keep his suspended sentence. Id. at 83, 813 P.2d 979. The Montana Supreme Court found that compelling the inmate to do so would cause a Fifth Amendment violation, absent any grant of immunity. Id. at 91, 813 P.2d 979.[14] So finding, the Montana Supreme Court reasoned:
Even though the defendant has already been convicted of the crime that he denies, our system still provides, as noted in the Thomas [v. United States, 368 F.2d 941 (5th Cir.1966) ] decision, for opportunities to challenge that conviction. For example, the defendant still had the right to challenge his conviction, based on newly discovered evidence, or by collateral attack. These are important rights guaranteed to every defendant under our criminal justice system, but would be rendered meaningless if the defendant could be compelled to admit guilt as a condition to his continued freedom.
Id. at 90-91, 813 P.2d 979.
¶ 88 Similarly here, even though Dyer has already been convicted of the crimes he denies, he still has the right to challenge those convictions based on newly discovered evidence or some other collateral attack. See RCW 10.73.100. Dyer's confession could also hinder his defense should the State seek to civilly commit him under chapter 71.09 RCW.
¶ 89 Dyer has met his burden to have conditions of parole established regardless of whether the Department of Corrections allows him to receive sex offender treatment. His documented rehabilitation, low recidivism risk, model prisoner behavior, and Herculean efforts to maintain his responsibilities as husband and father establish his parolability.
¶ 90 Moreover, the ISRB provides inadequate reasons to impose an exceptional sentence, exponentially disproportionate to that which would be imposed under the SRA.
¶ 91 The ISRB has abused its discretion. Dyer should be paroled.
¶ 92 I dissent.
ALEXANDER, C.J., C. JOHNSON, and CHAMBERS, JJ., concur.
NOTES
[1] In its decision, the ISRB noted that the 80 month increase to Dyer's minimum sentence was the functional equivalent to adding 60 months given that the hearing was deferred from April 2005 to October 2006.
[2] The dissent misstates our previous holding from Dyer I to reach its unprecedented position that this court should substitute its judgment for the ISRB's and release an untreated sex offender. Dissent at 771, 777. Contrary to the dissent's assertion, the court did not reverse the ISRB ruling in Dyer I based on a finding that Dyer met his burden to prove his rehabilitation. Dissent at 771. Rather, the court reversed the ISRB's decision because it was improperly supported by speculation and conjecture. Dyer I, 157 Wash.2d at 369, 139 P.3d 320 ("We instead remand to the ISRB for a new parolability hearing during which the ISRB must make its determination based on the evidence and testimony presented, and not on speculation and conjecture."). Even if the evidence suggested Dyer had met his burden of proving his rehabilitation, Dyer I did not restrict the ISRB from exercising its own judgment in rendering its parolability decision. Id. The dissent's erroneous understanding of Dyer I, however, naturally compels it to disregard the abuse of discretion standard of review and usurp the role of the ISRB.
[3] The dissent asserts the ISRB relied on the policy papers to reach its determination. Dissent at 772-73. This is not true. The ISRB concluded the findings from the policy papers had little applicability to Dyer's factual circumstances. App. to PRP, App. P at 11.
[4] Contrary to the dissent's assertion (dissent at 773 n. 8), the facts under which this court decided Ecklund are similar to the facts at present. Like Dyer, the petitioner in Ecklund exhibited exemplary behavior in prison and did not take responsibility for his crimes. 139 Wash.2d at 183, 985 P.2d 342. Justice Sanders voiced the dissenting view arguing the ISRB abused its discretion by basing its parolability decision, in part, on whether Ecklund confessed to his crimes. Id.; cf. dissent at 773. Notwithstanding these considerations, the court held the ISRB did not abuse its discretion by imposing an exceptional minimum term where Ecklund refused to admit his guilt because it prevented him from obtaining the necessary, rehabilitative treatment. 139 Wash.2d at 177, 985 P.2d 342. Dyer, like Ecklund, refuses to admit his guilt, which also prevents him from obtaining the necessary, rehabilitative treatment. Under Ecklund, the ISRB acted within its discretion to extend Dyer's minimum term.
[5] "Notwithstanding the provisions of subsection (2) of this section, the indeterminate sentence review board shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole." RCW 9.95.009(3).
[6] Dyer's minimum sentence was set by the ISRB at 240 months. The ISRB denied Dyer parole in 1994, 1998, and 2002, adding 60 months to his minimum term each time. In 2006, the ISRB increased his minimum sentence by 80 months for a total of 500 months.
[7] The dissent reaches its conclusion that the ISRB denied Dyer equal protection by completely reformulating Dyer's argument. Dissent at 775. Dyer argues the ISRB denied him equal protection by conditioning parole on an unavailable program. PRP at 45 ("Here, the Board has acknowledged that it will not release Dyer unless he completes the SOTP program, yet that program is not available to Dyer."). The dissent, however, constructs its equal protection argument around the inadequacy of the SOTP as an effective form of treatment. The dissent concludes, "[c]lassifying Dyer as unrehabilitated based on the fulfillment of treatment whose participants have a projected higher recidivism rate than those who are willing but unable to participate is not rationally related to the legitimate state objective of requiring rehabilitation." Dissent at 775-76. In addition, the dissent relies on the policy papers the ISRB determined to have little applicability to Dyer's factual circumstances to reach its conclusion. Id.; PRP App. P at 11. Accordingly, the dissent's novel equal protection argument lacks foundation and, therefore, fails.

The dissent also argues the ISRB violated Dyer's constitutional rights under the doctrine of unconstitutional conditions. Dissent at 776. Only the dissent raises this novel constitutional argument. It was not briefed or argued by the parties. The issue is not properly before the court.
[8] "Notwithstanding the provisions of subsection (2) of this section, the indeterminate sentence review board shall give public safety considerations the highest priority when making all discretionary decisions on the remaining indeterminate population regarding the ability for parole, parole release, and conditions of parole." RCW 9.95.009(3).

"The Board shall not, however, until his or her maximum term expires, release a prisoner, unless in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release." RCW 9.95.100.
[1] The ISRB's knowledge of the criminal justice system, i.e., that anyone can be "found innocent" of anything, appears challenged.
[2] But see Jacqueline McMurtrie, The Role of the Social Sciences in Preventing Wrongful Convictions, 42 AM.CRIM. L.REV. 1271, 1275 (2005) ("Mistaken eyewitness identification has long been recognized as a leading cause of wrongful convictions.").
[3] The concern here is two-fold. First, we should not require a factually innocent prisoner to lie to garner favor with the ISRB. Second, we should not reward a factually guilty prisoner's insincere expression of guilt and remorse. Distinguishing between these two groups requires a more nuanced approach than the ISRB has shown, especially in light of the overwhelming evidence of Dyer's parolability.
[4] But see Randy Green, Comprehensive Treatment Planning for Sex Offenders, in 1 THE SEX OFFENDER: CORRECTIONS, TREATMENT AND LEGAL PRACTICE 10-1, 10-4 (Barbara K. Schwartz & Henry R. Cellini eds., 1995) (recognizing refusal to admit guilt does not preclude the therapeutic benefits of sex offender treatment).
[5] Robert Barnoski, Sex Offender Sentencing in Washington State: Does Prison Treatment Program Reduce Recidivism? (Wash. State Inst. for Pub. Policy June 2006), available at http://www. wsipp.wa.gov/pubauth.asp; Robert Barnoski, Sex Offender Sentencing in Washington State: Who Participates in the Prison Treatment Program? (Wash. State Inst. for Pub. Policy June 2006), available at http://www.wsipp.wa.gov/pubauth. asp.
[6] According to the majority the ISRB did not rely on these studies to reach its decision. Majority at 765 n. 3. Yet, according to the ISRB's statement of decision and reasons the ISRB relied on one study to interpret the findings of the study submitted by Dyer; the ISRB admits it relied upon these studies. See Pers. Restraint Pet.App. P at 12.
[7] "The comparison group includes all incarcerated sex offenders who indicated a willingness to participate but did not (willing, applied, declined, and rejected)." R. Barnoski, Does Prison Treatment Program Reduce Recidivism?, supra, at 2 n. 6; see also R. Barnoski, Who Participates in the Prison Treatment Program?, supra, at 4 n. 6 ("This group includes all incarcerated sex offenders who indicated a willingness to participate but did not (willing, applied, declined, and rejected.")).
[8] By requiring an admission of guilt as a predicate to enrollment, the program may be populated with prisoners whose sincerity and willingness to rehabilitate is questionable. See Green, Comprehensive Treatment Planning for Sex Offenders, supra, at 10-6 ("Offenders frequently acknowledge the deed but blame alcohol, drugs, provocative victim behavior, or other outside factors.").
[9] In Ecklund petitioner's failure to admit his guilt was not the only basis on which the ISRB denied parole. Ecklund, 139 Wash.2d at 176, 985 P.2d 342. In Ecklund the petitioner "minimized his problems with alcohol" and refused to acknowledge the possibility he committed murder during an alcoholic blackout. Id. at 176-77, 985 P.2d 342. These circumstances were critical to our holding that the ISRB did not abuse its discretion. Similar circumstances are not present here.
[10] "Generally speaking, an incentive exists for all prisoners facing parole boards to admit guilt and apologize for the crime in order to maximize their chances for release, irrespective of their true feelings and culpability." Daniel S. Medwed, The Innocent Prisoner's Dilemma: Consequences of Failing to Admit Guilt at Parole Hearings, 93 IOWA L.REV. 491, 516 (2008).
[11] Implicit in this statutory scheme is the rehabilitative nature of punishment and parole as the next step in a prisoner's reentry into free society. We should never lose sight of the fact that Dyer, like all prisoners, is not a monster but "human[] like us and ... capable of myriad courses of action, honorable and dishonorable, ... they will act honorably, given a real choice. This means that we provide them with the resources to achieve self-determination, dignity, and self-respect." JOHN IRWIN, PRISONS IN TURMOIL 248 (1980). In other words, a man is "more than the sum of [his] worst acts." Marie Deans, Working Against the Death Penalty, in WRITING FOR THEIR LIVES: DEATH ROW U.S.A. 59, 62 (Marie Mulvey-Roberts ed., 2007).
[12] To deny parole in 1994, 1995, and 1998, the ISRB relied on psychological reports stating Dyer's recidivism risk was high. Apparently, the ISRB follows a psychological report when it is predictive of high recidivism but disapproves the psychological report when it is predictive of low recidivism. See majority at 764. But see Dyer, 157 Wash.2d at 366, 139 P.3d 320 (observing an abuse of discretion when the ISRB disregards current, favorable psychological reports).
[13] The majority unjustifiably limits appellate review of whether Dyer's constitutional right to equal protection has been violated by the ISRB's conditioning of parole on completion of sex offender treatment program. The majority elevates form over substance by requiring Dyer to articulate the exact phrase "doctrine of unconstitutional conditions" before it will even entertain the argument.
[14] This court also recognizes the Fifth Amendment violation. See Ecklund, 139 Wash.2d at 173, 985 P.2d 342 (stating, "`[t]he State may validly insist on answers to incriminating questions and properly administer its probation system so long as the State recognizes that the answers may not be used in a subsequent criminal proceeding'" (quoting State v. King, 130 Wash.2d 517, 529, 925 P.2d 606 (1996))).